J. Kenneth Hull v. Commissioner; Helen K. Hull v. Commissioner.
J. Kenneth Hull v. Commissioner
Docket Nos. 10431, 10433.
United States Tax Court
1948 Tax Ct. Memo LEXIS 145; 7 T.C.M. (CCH) 403; T.C.M. (RIA) 48121; June 29, 1948
*145 John Moore Robinson, Esq., 650 S. Spring St., Los Angeles, Calif., for the petitioners. A. J. Hurley, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding is brought for a redetermination of deficiencies in petitioners' income tax for the years 1943 and 1944 as follows: Docket
No.
1943
1944
J. Kenneth Hull
10431
$2,396.74
$2,802.90
Helen K. Hull
10433
2,396.73
2,802.90 The only question for disposition is whether or not during the years in question petitioner J. Kenneth Hull was a bona fide resident of a foreign country, within the meaning of Internal Revenue Code, section 116(a). The parties filed a stipulation of facts, and evidence was adduced at the hearing. Findings of Fact The stipulated facts are hereby found accordingly. Petitionesr are husband and wife and citizens of the United States, residing at 1368 Wilbury Road, San Marino, California. For convenience, J. Kenneth Hull will be hereinafter referred to as petitioner. Petitioners filed timely income tax returns upon a community property basis for the years 1943 and 1944 with the collector *146 of internal revenue for the sixth district of California. Petitioners have two children, who at the time of the hearing were 16 and 18 years of age. For a period of 17 years prior to June, 1941, petitioner was employed by the California bank in Los Angeles. On June 16, 1941, petitioner entered the employ of Lockheed Aircraft Corporation of Burbank, California, and has been employed continuously by that corporation or its subsidiaries up until the date of the hearing. Early in 1942 Lockheed Aircraft Corporation entered into a contract with the United States Government, in which the corporation agreed to organize, equip, and operate an aircraft depot in North Ireland in connection with the prosecution of the war. The project was designated as "Operation Magnet." At or about this time petitioner was approached by Barker, an official of Lockheed Aircraft Corporation, and asked if he was interested in entering foreign service in the United Kingdom as an assistant to Ogden, who was then general manager for Lockheed Overseas Corporation (a wholly-owned subsidiary of Lockheed Aircraft Corporation). Petitioner was encouraged to undertake the work by Barker's statement that it would be *147 a natural thing for Ogden and petitioner to carry on the post-war sales activity of Lockheed in the United Kingdom. Petitioner consented to accept overseas service only because of the suggested possibility of taking part in the post-war sales program of Lockheed in Europe. He was not interested in overhaul and repair work, as such, and had no intention of remaining in the United Kingdom or Europe after the war emergency if the opportunity in the sales program did not materialize. Neither petitioner nor Ogden had been engaged in sales work with Lockheed before. Sometime prior to July 1, 1942, petitioner entered into a contract in writing with Lockheed Overseas Corporation, which contract provided in part as follows: "ARTICLE 1. TIME AND DURATION OF EMPLOYMENT "Contractor employs Employee to render services in connection with said aircraft depot with such duties as reasonably may be assigned to him, and Employee accepts such employment with knowledge of the conditions recited above. Subject to the terms and conditions hereinafter set forth, Employee's employment hereunder shall commence when he reports for duty at a point within the United States to be designated by Contractor, *148 at the time and place designated by Contractor, and shall continue until November 1, 1942, or such later date as may be agreed upon and thereafter until sixty (60) days after return transportation to the United States is made available by Contractor, it being understood that such return transportation shall be made available on November 1, 1942, or the later date agreed upon or as soon thereafter as is practicable under the circumstances then existing. "ARTICLE 7. HOUSING, SUBSISTENCE AND MEDICAL SERVICES "During the time that Employee is employed hereunder and remains at the place or places of his duty outside the United States, Contractor shall furnish or cause to be furnished, without cost to Employee, such adequate food, lodging, special clothing and equipment, medical, nursing, and hospital services and treatment and recreational facilities as circumstances may reasonably permit. "Employee shall submit prior to departure and from time to time during his employment to such vaccination, innoculation, and/or any other medical, dental, surgical, nursing, and/or hospital treatment, preventative or curative, as the Contractor or other medical staff at the destination or elsewhere *149 may from time to time specify, without expense to Employee. "Contractor may direct the return to the United States of Employee, if in Contractor's judgment Employee's health condition is unfavorable." Pursuant to the terms of his contract on June 25, 1942, petitioner sailed from New York and arrived in North Ireland sometime in the month of July, 1942. He entered North Ireland on a limited visa as an employee of Lockheed Overseas Corporation. On or about November 1, 1942, petitioner's contract with Lockheed Overseas Corporation was extended by agreement of the parties to May 1, 1943, at which time he entered into a new contract. This new contract provided in part as follows: "ARTICLE 1. TIME AND DURATION OF EMPLOYMENT "Contractor employs Employee to render services in connection with said aircraft depot with such duties as reasonably may be assigned to him, and Employee accepts such employment with knowledge of the conditions recited above. The term of Employee's employment hereunder shall * * * continue, subject to the terms and conditions hereinafter set forth, for (i) the duration of the contract between the Government and Lockheed as from time to time extended and for *150 such period after the termination or completion of said contract as Contractor may, in respect of such Employee, deem necessary for the winding up of the operations carried on under said contract after such termination or completion; and (ii) thereafter until return transportation to the United States for such Employee is made available by Contractor or by the Government to Contractor which transportation Contractor shall use its best efforts to obtain as promptly after the end of the period described in the foregoing clause (i) as is practicable under the circumstances then existing; * * *." At the time of petitioner's departure from the United States he was given to understand that by reason of the circumstances then existing his family would not be permitted to accompany him overseas. The policy of Lockheed at that time was not to permit wives or families in the European theatre. From the time of his arrival in the British Isles and continuing throughout the years 1943 and 1944 petitioner acted as assistant manager of Lockheed Overseas Corporation in the United Kingdom. During 1943 and 1944 petitioner performed his work for Lockheed in North Ireland, Scotland, Liverpool, and *151 London. During this period he lived in quarters at the base and at various hotels. Petitioner received as compensation for personal services rendered to Lockheed in the British Isles during the taxable year 1943, the sum of $19,825, and during the taxable year 1944 the sum of $21,258.92, of which sums 90 percent was deposited by Lockheed at petitioner's direction to the joint accounts of petitioner and his wife with the California Trust Company at Los Angeles, and the California Bank at San Gabriel, California. Petitioner did not engage in any sales activity on behalf of Lockheed during the years 1943 and 1944. Petitioner and Ogden acted as listening posts for the future sales program. At that time Lockheed was completely occupied with military work and no commercial aircraft were available for sale or delivery, and Lockheed was able to plan only generally for post-war business. In 1943 it appeared to petitioner that it might be possible to arrange to have his family join him overseas. He was not able to find suitable living accommodations, and he abandoned the idea of bringing his family abroad until a decision was made upon his future position with Lockheed in the foreign *152 field and until such time as conditions would permit their coming. On June 30, 1944, the United States Government contract with Lockheed covering Operation Magnet terminated and petitioner was in charge of winding up its affairs for the next several months. In this connection he returned to the United States on July 27, 1944, for a period of three weeks. Before returning to England he directed Lockheed to deposit 90 percent of his future pay to the joint account in the California Bank at San Gabriel. He did this in order to avoid the existing currency restrictions in England, which would have prevented his taking money received there out of the country. On September 11, 1944, petitioner returned to England to continue the management of the remaining Lockheed bases in England and Scotland. Shortly after his arrival in England he wrote a letter to his wife, dated September 24, 1944, in which he advised her that the progress of the war in Europe was still unpredictable, and that until a decision was made by Lockheed on its post-war plans, his future there would continue indefinitely. He wrote that he and his associate had large plans which they felt certain to be of long duration; that *153 they planned on what to do when his family came over - where to live and how long to stay. He advised his wife to have her tonsils removed and get herself in good condition "in the hopes of an early decision." It was contemplated that petitioner's family might join him abroad and to this end consideration was given to the disposition of their house in California and to plans for schooling for the children abroad, including arrangements to be made after the close of the war in Europe. In December of 1944 petitioner received word from Lockheed that Sal Voorhees had been awarded the sales agency for Lockheed Aircraft in the United Kingdom instead of petitioner and Ogden, and that petitioner would not have any part in the postwar sales program in Europe. Upon learning this, petitioner immediately began to make preparation to return to his home in California. Petitioner returned to the United States in March, 1945, and since that time has been employed by Lockheed in California. Petitioner paid no income taxes either to the United States or the United Kingdom for the year 1943. He paid no income taxes to the United States for the year 1944, but income taxes were deducted from his *154 earnings and paid to the British Government for the period from September to December, 1944, for which taxes he was reimbursed by Lockheed Overseas Corporation. At no time did petitioner make application to become a citizen of any foreign country, and he at all times intended to retain his American citizenship. Throughout the period that petitioner remained overseas his wife and his two minor children resided at their home at 1368 Wilbury Road, San Marino, California. Petitioner was not a bona fide resident of a foreign country or countries during the taxable years 1943 and 1944. Opinion In principle, we find nothing to distinguish this proceeding from the recent cases involving the same problem, including Michael Downs, 7 T.C. 1053, affirmed (C.C.A., 9th Cir.), 166 Fed. (2d) 504, in which certiorari has now been denied by the Supreme Court (June 1, 1948), and particularly Ralph Love, 8 T.C. 400. In the latter case, the petitioner laid "much stress in his brief on the fact that in 1942 he met an Irish girl and became engaged to marry her and that one condition which she made in accepting him as her future husband was that he would go *155 into business in Ireland and reside there permanently." As in that case, "we have carefully considered all the facts in the record * * * and we think that the most that these facts add up to when they are considered in their entirety is that at some future time petitioner and his wife [intended] to take up their residence" abroad. Following the same principle, we must hold that that is not enough to make petitioner a "bona fide resident" of a foreign country in the years in question within the meaning of the statute. Decision will be entered for the respondent.